23CA1686 Peo v Rabinkov 02-12-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1686
City and County of Denver District Court No. 12CR922
Honorable James F. Hartmann, Jr., Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Leonid A. Rabinkov,

Defendant-Appellant.

ORDER AFFIRMED

Division VI
Opinion by JUDGE GROVE
Yun and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 12, 2026

Philip J. Weiser, Attorney General, Yaried A. Hailu, Assistant Attorney General
Fellow, Denver, Colorado, for Plaintiff-Appellee

Gregory Lansky, Alternate Defense Counsel, Aurora, Colorado, for Defendant-
Appellant

¶ 1    Defendant, Leonid A. Rabinkov, appeals the postconviction court's order denying his claim of ineffective assistance of counsel. We affirm.

## I.    Background

¶ 2    In 2012, police officers found George DeCurnou in front of his apartment building, bleeding from his head and neck. DeCurnou later died from his injuries.

¶ 3    During their investigation, police collected handwritten notes, cell phone records, and fingerprints from DeCurnou's apartment suggesting that Rabinkov had been present around the time DeCurnou was stabbed.[1] They also found a bloody hammer and spoke with a witness who called 911 after hearing DeCurnou yell at someone to put down a knife. The investigation also yielded video footage placing Rabinkov at the apartment around the time of the incident.

¶ 4    Rabinkov was initially charged with attempted first degree murder, first degree assault, and two sentence enhancers. After

---

[1] Additional DNA evidence was gathered during the investigation, but the results were either inconclusive or negative for Rabinkov's DNA.

DeCurnou died in the hospital, however, the People amended the complaint, substituting attempted first degree murder with first degree murder. Later, they dropped the other three charges.

¶ 5     During pretrial proceedings, Rabinkov's defense team[2] raised concerns about Rabinkov's competency to stand trial due to his deafness and cognitive impairments. Counsel requested that the competency exam be expanded to include "serious language, cognitive, and or development deficiencies," and that Rabinkov complete specific cognitive tests to measure his verbal understanding and working memory. Counsel also asked that Rabinkov be evaluated by someone fluent in American Sign Language (ASL) and familiar with deaf culture to better account for the cultural, social, parenting, and educational issues Rabinkov encountered in life.

---

[2] Rabinkov was first represented by Deputy State Public Defenders Rebekka Higgs and Kelly Meilstrup. Deputy State Public Defender Demetria Trujillo had joined the team by the time Rabinkov's competency evaluation was released. Meilstrup and Higgs withdrew as counsel several months after Rabinkov was declared competent to proceed. Trujillo was then joined by Deputy State Public Defender Shanelle Kindel, and the pair represented Rabinkov for the remainder of the case.

¶ 6     The court ordered a competency evaluation to be completed by the Colorado Department of Human Services and encouraged the Department to have it "conducted by individuals who are familiar with or have experience with issues affecting competency of deaf individuals."

¶ 7     Thomas Gray, Ph.D., a forensic psychologist who served as the clinical coordinator of the court services department at the Colorado Mental Health Institute at Pueblo, evaluated Rabinkov for competency.  He conducted the evaluation with the assistance of ASL interpreters.  There is no mention in his report of the requested cognitive tests.  Gray determined that Rabinkov did not have "a mental or developmental disability that prevented him from consulting with his lawyer within a reasonable degree of rational understanding to assist in his defense or from having a rational and factual understanding of the criminal proceedings."  He concluded that Rabinkov was competent to stand trial.

¶ 8     Neither party requested a competency hearing or a second evaluation.  Rabinkov's lawyers did not object to the court's finding that Rabinkov was competent to proceed.

¶ 9      Following plea negotiations that we discuss further below, Rabinkov entered into a plea agreement and pleaded guilty to second degree murder. The parties stipulated that he would be sentenced to thirty-two years in the custody of the Department of Corrections, plus five years of mandatory parole. The district court accepted the plea agreement and sentenced Rabinkov accordingly.

¶ 10     In 2017, Rabinkov filed a motion alleging ineffective assistance of counsel and requesting the appointment of postconviction counsel. The court ordered that an attorney from the Office of Alternate Defense Counsel (OADC) represent him. The order was served digitally to Rabinkov's first two defense attorneys — Rebekka Higgs and Kelly Meilstrup — the Denver District Attorney's Office, and the Denver Public Defender's Office. There is no indication that it was served to the OADC. Records show that Rabinkov's first two attorneys never opened the document, but an unidentified individual from the Denver Public Defender's Office did.

¶ 11     Approximately three years later, Rabinkov contacted another attorney on his defense team, Demetria Trujillo, about the court's order. Trujillo had not been aware of Rabinkov's motion until she received his letter, but she promptly emailed the order to the OADC

once she learned of it. The OADC then assigned Rabinkov postconviction counsel, who filed a motion for postconviction relief on his behalf.

¶ 12    Rabinkov's motion asserted that his defense attorneys provided ineffective assistance in three different ways: (1) by destroying his case file, thus hindering his ability to seek postconviction relief; (2) by failing to conduct an adequate investigation of his cognitive deficits by consulting with experts who could bolster potential defenses focused on competency, insanity, or impaired mental condition; and (3) by failing to adequately advise him on his plea deal and the potential consequences of trial. After an evidentiary hearing, the postconviction court denied all of Rabinkov's claims in a detailed written order. Rabinkov now appeals.

## II.    Standard of Review

¶ 13    A postconviction court's ruling on a motion for postconviction relief filed under Crim. P. 35(c) presents a mixed question of fact and law. *People v. Sharp*, 2019 COA 133, ¶ 12. We defer to the court's findings of fact if they have record support, but we review any legal conclusions de novo. *Id.* The postconviction court

determines the weight and credibility to be given to the testimony of witnesses in a Crim. P. 35(c) hearing. *People v. Hardin*, 2016 COA 175, ¶ 39. Accordingly, "[w]here the evidence in the record supports the findings and holding of the postconviction court that presided over an evidentiary hearing, the judgment will not be disturbed on review." *People v. Wardell*, 2020 COA 47, ¶ 27.

### III. Applicable Law

¶ 14    To prevail on a claim of ineffective assistance of counsel under Crim. P. 35(c), a defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

¶ 15    Under the performance prong, a defendant must prove that counsel's representation fell below an objective standard of reasonableness. *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007). However, there is a strong presumption that counsel's performance was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

¶ 16    Under the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *People v. Garcia*, 815 P.2d 937, 943 (Colo. 1991) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "A reasonable probability means a 'probability sufficient to undermine confidence in the outcome.'" *Hagos v. People*, 2012 CO 63, ¶ 17 (quoting *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003)).

## IV.    Case File

¶ 17    Rabinkov first argues that the postconviction court erred by ruling that he had not suffered any prejudice due to his defense counsel's failure to preserve his case file. We disagree.

### A.    Legal Standards

¶ 18    Colo. RPC 1.16A(c)(3), as relevant here, requires a lawyer in a criminal matter to retain a client's file for five years from the date of sentencing, "if the matter resulted in a conviction for [a] felony and neither the conviction nor sentence was appealed." If an attorney has knowledge of pending or threatened proceedings related to the matter, the client's file should not be destroyed. Colo. RPC 1.16A cmt. 4.

¶ 19    Before destroying a file, a lawyer must give written notice to the client of their intent to do so. Colo. RPC 1.16A cmt. 5. The date

of destruction must be no less than thirty days after the notice is given. *Id.* This requirement may be satisfied if the client is given the lawyer's written file retention policy during or after representation of the client. *Id.* A lawyer may not, however, destroy files if the attorney knows that there are proceedings pending or threatened in the matter for which the lawyer created the files. *Id.*

¶ 20 The Office of the Colorado Public Defender's internal policies generally align with these rules, but they include one additional requirement potentially relevant here: a file should be retained for the life of the client if it contains results of DNA testing that significantly impact the case.

## B. Additional Facts

¶ 21 The Denver Public Defender's Office destroyed Rabinkov's file in January 2020, six years after he was sentenced. It did so even though Rabinkov had requested appointment of counsel to pursue a postconviction motion, and the district court had issued an order appointing an attorney from the OADC for that purpose. And, the postconviction court found, there was no evidence that Rabinkov either received a copy of the Public Defender's Office's file retention

policies or that the Public Defender's Office had timely notified him of its plans to destroy the file.

¶ 22     As we understand the postconviction court's order, it either found (or assumed without deciding) that the Public Defender's Office's failure to notify Rabinkov about the pending destruction of his file amounted to deficient performance. Despite that finding, the court rejected Rabinkov's claim because it found that Rabinkov had failed to show that the destruction of the file prejudiced him. *See People v. Washington*, 2014 COA 41, ¶ 20 ("If a court determines that a defendant has failed to prove either prong of the *Strickland* analysis, it may deny an ineffective assistance claim without addressing the other prong.").

¶ 23     As support for its conclusion, the court noted that Rabinkov's postconviction counsel had in fact received copies of the discovery and had access to the court file. The only contents of the file counsel did not receive were "any handwritten notes that were created by his trial attorneys." The court observed that, during the evidentiary hearing, Trujillo testified about the details of her

representation.[3]  Trujillo's testimony shed light on the reasoning behind her decision-making, and postconviction counsel queried her about pertinent information missing from Rabinkov's file. Accordingly, the court determined that Rabinkov's claim of prejudice was "purely speculative" and did not merit relief.

### C.    Analysis

¶ 24    Rabinkov contends that the postconviction court erred by finding that he failed to show prejudice.  He argues that trial counsel's handwritten notes were critical to his effort to show ineffective assistance of counsel because they might have revealed, among other things, (1) any advice that trial counsel provided; (2) the number of times trial counsel met with Rabinkov; (3) if ASL interpreters were present during meetings; (4) the reasoning behind trial counsel's strategic decisions; and (5) whether trial counsel had concerns related to Rabinkov's competency and mental state.

---

[3] Trujillo was the only member of the defense team called as a witness at the postconviction hearing.  In its order denying Rabinkov's request for postconviction relief, the court noted, "[P]resumably, [postconviction counsel] could have also interviewed other members of his trial defense team."

¶ 25    Although there were gaps in Trujillo's recollection, her testimony at the postconviction hearing both shed light on the number of times she met with Rabinkov and confirmed the presence of an ASL interpreter at each meeting. Trujillo also discussed the plea negotiations, the strength of the prosecution's case, and potential defense strategies — including how Rabinkov's physical and mental difficulties could factor into Rabinkov's defense in a trial.

¶ 26    To the extent Rabinkov asserts that he was prejudiced by the gaps in Trujillo's recollection, we agree with the postconviction court's observation that postconviction counsel "presumably . . . could have also interviewed other members of his trial defense team" to fill in those gaps. More importantly, however, we agree with the postconviction court's conclusion that Rabinkov's claim of prejudice is speculative. *See People v. Finney*, 2012 COA 38, ¶ 66 ("We will affirm a trial court's determination that the defendant was not prejudiced when the evidence only provides speculative proof of prejudice."), *aff'd*, 2014 CO 38; *People v. Chipman*, 2015 COA 142, ¶ 63 (A speculative claim of prejudice cannot "form the basis for a valid claim of ineffective assistance of counsel."). In short, absent

11

any indication that attorney work product in the file would reveal material strategic errors or omissions by the defense team not already addressed by the other evidence in the record, we cannot conclude that Rabinkov was prejudiced by the file's destruction. Accordingly, we discern no error in the postconviction court's determination that Rabinkov failed to prove he was prejudiced by the destruction of his case file.

## V.    Experts

¶ 27    Rabinkov alleges that he received ineffective assistance of counsel because his defense team did not consult with an expert neuropsychologist or psychologist about his physical and cognitive disabilities.  He argues that, due to his attorneys' failure to conduct an adequate investigation — and their ensuing failure to inform the prosecution and court that he likely suffers from congenital rubella syndrome — they did not fully comprehend or communicate the impact of his disabilities on (1) his competency to proceed; (2) his potential defenses; or (3) the course of plea negotiations.

### A.    Testimony at the Evidentiary Hearing

¶ 28    At the evidentiary hearing, postconviction counsel called three expert witnesses — a neuropsychologist, a medical expert, and an

expert on criminal defense — to discuss the defense team's failure to thoroughly investigate Rabinkov's physical and cognitive disabilities.

¶ 29　　The psychological expert was a licensed clinical psychologist specializing in neuropsychology with extensive experience evaluating deaf and hearing-impaired individuals. To prepare for her testimony, she reviewed medical records related to Rabinkov's case, including Gray's initial competency evaluation, and also met with Rabinkov by video for a total of nine hours with the assistance of an ASL interpreter. She did not review the underlying facts of the case nor interview any members of the defense team.

¶ 30　　During their meetings, which took place approximately ten years after the proceedings that led to Rabinkov's guilty plea, the psychologist administered a series of tests examining Rabinkov's perceptual reasoning, working memory, and mental processing speed. Rabinkov's scores were in the low average range, the inferior range, and the lowest first percentile, respectively. Based on these results, the psychologist opined that Rabinkov was incompetent to proceed at the time he entered his guilty plea. She explained that, due to Rabinkov's cognitive deficiencies — which she said were

consistent with an individual diagnosed with congenital rubella syndrome — he was likely unable to understand or retain complex information, although he would be able to repeat information told to him.

¶ 31 Rabinkov's medical expert, a physician's assistant, reviewed Rabinkov's medical history but did not meet with him personally. Based on his review, he testified that Rabinkov likely suffered from congenital rubella syndrome, which develops in utero when a mother contracts rubella during pregnancy. He explained that a definitive diagnosis was not possible because it requires a blood test performed during a child's first year of life, but he said that Rabinkov — who was born and spent his childhood in Ukraine — faced a greater risk of the disease due to the lower vaccination rates among that population.

¶ 32 Describing the severity of Rabinkov's condition, the medical expert opined that Rabinkov displayed a "marked" manifestation of congenital rubella syndrome, which is the highest level on the spectrum when measuring the degree of symptoms. Rabinkov suffered from ophthalmologic abnormalities, congenital heart disease, and a hearing impairment. He also displayed

microcephaly — a condition where the skull diameter is more than two standard deviations below the norm for his age, weight, and sex — along with developmental delays. The expert said that impacts from the disease include a diminished ability to engage in a risk-benefit analysis and difficulties in assessing the potential repercussions of certain actions. Rabinkov's symptoms, in the expert's opinion, profoundly impacted his day-to-day life and likely made him unable to competently make medical decisions on his own behalf.

¶ 33 Rabinkov's expert on criminal defense testified about the adequacy of the defense team's investigation into Rabinkov's condition. She reviewed Rabinkov's court file, which included his medical records and competency exam, but did not speak with Rabinkov or any members of the defense team. She opined that Rabinkov's attorneys did not meet prevailing professional norms because they failed to retain professional experts to further explore his circumstances — including how congenital rubella syndrome may have impacted his competency, his potential trial defenses, or arguments in favor of mitigation in plea discussions or sentencing. The expert explained that reasonably competent defense counsel

would have recognized the importance of Rabinkov's disabilities to the case, as well as the difficulties that those disabilities created for attorney-client communications and, as a result, would have conferred with a neuropsychologist or psychologist to investigate the matter further.

¶ 34   Trujillo addressed many of these issues during her own testimony. She said that her personal interactions with Rabinkov did not give her reason to challenge the competency evaluation. Trujillo recalled that, during these meetings, which were facilitated by ASL interpreters, she engaged in back-and-forth conversations with Rabinkov that, in her view, demonstrated his comprehension. She stated that when Rabinkov did not understand, he asked for clarification. She added that her perception of his comprehension was bolstered by evidence showing Rabinkov was self-sufficient enough to navigate Denver's bus system when traveling to DeCurnou's apartment.

¶ 35   Trujillo also discussed the plea negotiation process. Given the strength of the prosecution's evidence, Trujillo did not believe there was any available defense that would result in a full acquittal, and she conveyed that belief during multiple conversations with

Rabinkov regarding his potential offers and the risks of going to trial. She advised him of the inculpatory evidence that would likely be introduced, opined that the brutality of the crime and the strength of the evidence increased the risk of a first degree murder conviction, and explained that even a second degree murder conviction could result in a forty-eight-year sentence. Rabinkov asked Trujillo to attempt to negotiate an offer for probation. However, once he understood that probation was likely off the table, he requested a deal that would allow him to be released from prison as soon as possible.

¶ 36　　Trujillo wrote a mitigation letter and discussed plea options with the prosecution. The letter detailed Rabinkov's difficult background and the extent of his physical and cognitive disabilities — although it did not specify that he likely has congenital rubella syndrome. Nonetheless, Trujillo testified during the postconviction hearing that Rabinkov's "symptomology was undisputed" by the prosecution, and that, in her view, Rabinkov's challenges contributed to the prosecution's acceptance of a thirty-two-year stipulated sentence for second degree murder.

¶ 37    After the hearing, the postconviction court found that Rabinkov failed to prove either deficient performance or prejudice.

## B.    Competency

¶ 38    Rabinkov argues it was objectively unreasonable for the defense team not to consult with an expert neuropsychologist or psychologist after Gray's evaluation found him competent to proceed.  He asserts that defense counsel knew about his background and his physical and cognitive disabilities, as well as the fact that "maternal rubella" can cause deafness and lifelong medical and behavioral problems.  He maintains his attorneys were also aware that nothing in Gray's competency evaluation addressed any of the major points his competency motion had raised and notes that, at the postconviction hearing, the criminal defense expert opined that the defense team's lack of action on this issue was objectively unreasonable.

¶ 39    The postconviction court determined that the defense team's performance on the competency issue was neither objectively unreasonable nor prejudicial to the defense.  In reaching this conclusion, the court gave great weight to Trujillo's testimony that, while representing Rabinkov, she "did not observe anything in her

communications or interactions" that "led her to believe [Rabinkov] was incompetent to proceed." It gave less weight to the testimony of the criminal defense expert because the expert "did not speak with [Rabinkov] or the trial defense team" and therefore "did not have a complete picture of why certain actions were taken and others were not."

¶ 40    We are bound by the postconviction court's weight and credibility determinations. *See Dunlap*, 173 P.3d at 1061-62. And, based on those findings, as well as other evidence in the record, we agree with the court's conclusion that the defense team's approach to the competency issue was not objectively unreasonable. (Accordingly, we need not address *Strickland*'s prejudice prong. *See Washington*, 2014 COA 41, ¶ 20.)

¶ 41    That other evidence includes the court's finding that, based on its own review of the record, Rabinkov displayed an ability "to understand and retain important advice provided by his attorneys," unprompted, during his conversations with Gray. It also includes evidence of an evaluation requested by Rabinkov's defense team and conducted by a licensed clinical social worker (LCSW) with the Mental Health Center of Denver before Gray's competency

evaluation was requested. The LCSW, who had experience working with deaf individuals, determined Rabinkov's "ASL abilities were within normal limits" and also reported that his "cognitive abilities were fine when he completed the mini mental health examination." And it includes the postconviction court's observation that, if Rabinkov's competency truly had been an issue, one would expect his highly experienced defense team to press for a second evaluation or object to the court's ultimate competency finding. *See People v. Newmiller*, 2014 COA 84, ¶ 22 (relying in part on postconviction court's finding that trial counsel were "highly experienced criminal defense attorneys").

¶ 42    Because there is substantial record support for the postconviction court's finding that the defense team's approach to the competency issue was not objectively unreasonable, we leave it undisturbed.

## C.    Legal Defenses

¶ 43    Rabinkov next asserts that his defense team should have consulted with an expert familiar with his disabilities to effectively advocate on his behalf. He says it was impossible for his attorneys to make an informed decision about his legal defense without such

consultation.  We agree with the postconviction court's conclusion that Rabinkov did not show that his attorneys' actions were objectively unreasonable.

¶ 44    Counsel has a duty to make reasonable investigations into appropriate trial defenses.  *Strickland*, 466 U.S. at 691.  A reasonable investigation does not mean a perfect investigation. *Harrington v. Richter*, 562 U.S. 86, 108 (2011) (stating that counsel is entitled to allocate limited resources based on their expertise in effective trial tactics and strategies).  Defense counsel need only conduct an investigation sufficient to reveal potential defenses as well as weaknesses in the prosecution's case.  *People v. Dillard*, 680 P.2d 243, 245 (Colo. App. 1984).

¶ 45    Our review of the record and the postconviction court's reasoning convinces us that the defense team made a reasonable investigation into Rabinkov's physical and cognitive issues, even though they did not consult with a neuropsychologist or psychologist.  *Newmiller*, ¶ 45 ("A reasonable investigation means one that is 'sufficient to reveal potential defenses and the facts relevant to guilt.'" (citation omitted)).  Hence, we agree with the postconviction court's conclusion that "there are many different

defense strategies that may be pursued" by counsel and, here, Rabinkov's defense strategy was objectively reasonable.

¶ 46 As discussed above and in the postconviction court's order, early in the case, defense counsel conferred with an LCSW experienced in the field about Rabinkov's physical and cognitive disabilities. Although the LCSW was not a neuropsychologist or psychologist, she had experience working "with deaf individuals and their families through [the Mental Health Center of Denver]," including "intakes and assessments." The LCSW concluded that Rabinkov's "cognitive abilities were fine" and his "ASL abilities were within normal limits." Nonetheless, after meeting with the LCSW for an evaluation of Rabinkov's condition, defense counsel incorporated her recommendations regarding specific testing into the motion for Rabinkov's competency evaluation.

¶ 47 Despite the LCSW's opinion that his "cognitive abilities were fine," Gray's evaluation concluding Rabinkov was competent, and Trujillo's own impressions, the defense team continued to investigate Rabinkov's physical and cognitive disabilities throughout the case. The record shows that defense counsel sought out Rabinkov's probation records and mental health

22

records, interviewed family members, and sought records about his hospitalizations in Ukraine to better understand his disabilities. Much of the information gathered in this investigation appeared in the mitigation letter that defense counsel sent to the prosecution in advance of the plea. It was also the basis for Trujillo's conclusion that, given the evidence against Rabinkov and the nature of the crime, a defense based on Rabinkov's physical and cognitive disabilities would not lead to a full acquittal, and a plea deal presented a better overall strategy.

¶ 48 Based on the extent and depth of the defense team's investigation into Rabinkov's condition — along with its effective use of the information uncovered during that investigation — we agree with the postconviction court's ruling that the failure to consult a neuropsychologist or psychologist when formulating and pursuing defense strategies was not an objectively unreasonable decision.

### D. Plea Deal

¶ 49 We also reject Rabinkov's argument that the defense team's failure to consult with a neuropsychologist or psychologist about

his physical and cognitive disabilities before negotiating his plea deal amounted to ineffective assistance of counsel.

¶ 50 The thrust of Rabinkov's argument is that appropriate expert consultation would have resulted in a specific diagnosis of congenital rubella syndrome, which could have then been communicated to the prosecution in the mitigation letter or through other means, and presumably would have led to a better plea offer.

¶ 51 However, as the postconviction court noted, with the exception of microcephaly, the mitigation letter's description of Rabinkov's symptoms was nearly identical to the indications of congenital rubella syndrome that Rabinkov's medical expert described at the hearing. The postconviction court included the following comparison in its order:

| *Mitigation Letter of June 18, 2013* | *Congenital Rubella Syndrome Manifestations* |
|---|---|
| Defendant's mother contracted chicken pox while pregnant with Defendant. | Defendant's mother very likely contracted rubella while pregnant with Defendant. |
| Defendant has been deaf since birth. | Hearing impairment. |
| Defendant suffered from a heart defect at birth, requiring monitoring and treatment of his narrowed aorta. | Congenital heart issues. |
| Defendant had retinal degeneration at birth, requiring retinal injections. | Congenital abnormalities of the eyes |
| Defendant was developmentally delayed, as identified at a young age by teachers at the school for deaf children. Defendant struggled in school. | Developmental delays |
| Defendant would run away for weeks at a time as a teenager, and he was found living with "Gypsies" on the streets. Defendant was hospitalized multiple times in a children's psychiatric ward in Ukraine for bizarre behavior. | Difficulty understanding how actions may impact results, risk versus benefit analysis, and what repercussions may result from certain actions. |
| N/A | Microcephaly (reduced skull size) |

¶ 52     Like the postconviction court, we see very little substantive difference between the conditions described in the mitigation letter and a formal diagnosis of congenital rubella syndrome. And we

25

must defer to the court's decision to credit Trujillo's testimony that, given the facts and evidence, she reasonably determined that putting a medical diagnosis to Rabinkov's symptoms "would not have made a difference in plea negotiations." Accordingly, we agree with the postconviction court's conclusion that the defense team did not act unreasonably by failing to consult an expert for the purpose of negotiating a better plea agreement.

## VI.   Communication

¶ 53    Finally, Rabinkov contends that his defense team provided ineffective assistance of counsel because they failed to communicate and advise him effectively on the risks of proceeding to trial versus accepting a plea deal. He argues they deficiently performed by failing to explain how his cognitive disabilities could have been used as defenses at trial. And he asserts that, according to jail records, he rarely met with his defense counsel while he was in pretrial incarceration and that ASL interpreters were not present for all of these meetings. He argues there is a reasonable probability that if his attorneys had provided adequate advice, he would have rejected the plea offer and gone to trial. We are not persuaded.

¶ 54    In rejecting this argument, the postconviction court credited Trujillo's testimony that she discussed Rabinkov's "mental and physical conditions with him" and "explained how this information could be used at trial," and while she "didn't use the words 'mental slowness,'" she imparted the principles of a cognitive disabilities defense. The court also noted that Rabinkov first "request[ed] probation" when Trujillo explained the risks of trial, and then, once she explained that probation was likely off the table, he sought a plea deal that would give him the shortest possible period of incarceration.

¶ 55    Regarding the number of visits between Rabinkov and members of the defense team, the postconviction court declined to credit the jail records that Rabinkov relied on to show that he rarely met with defense counsel and that ASL interpreters were not always present when meetings did occur. The court reasoned that there were "large portions" of the jail records that were blacked out by "presumably the Denver Sheriff's Office," obscuring exact visitation details. The court also noted that Rabinkov did not present testimony establishing the records' completeness or accuracy. Moreover, the court found there was substantial evidence that the

records were inaccurate or incomplete. Trujillo, for example, appears to have visited Rabinkov eight times even though jail records list only four. And there was no record of a visit by Higgs shortly before the competency evaluation, even though Rabinkov cited her legal advice as a basis for declining to answer certain questions posed during that process.

¶ 56 As for the likelihood that Rabinkov would have rejected the plea offer and gone to trial on the first degree murder charge, we agree with the postconviction court's conclusion that the chances of that occurring were slim. *See Hill*, 474 U.S. at 58-59 (A defendant who challenges a guilty plea based on ineffective assistance of counsel must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."). As Trujillo explained, Rabinkov's defenses were limited and were hampered by his evolving story about the incident and the nature of DeCurnou's injuries. Given the weaknesses in the defense, accepting a plea offer to a lesser charge was a rational decision.

¶ 57 Rabinkov's statements during the plea negotiations also show an inclination to avoid trial. Facing a life sentence for first degree

28

murder and a possible forty-eight-year sentence if convicted of second degree murder, he repeatedly asked for a plea deal with as little prison time as possible. *See People v. Corson*, 2016 CO 33, ¶ 35 (explaining that when assessing whether a defendant would elect to plead guilty or go to trial, appellate courts have considered the comparative sentencing exposure between a proffered plea bargain and conviction after trial). Accordingly, we agree with the postconviction court's conclusion that Rabinkov failed to sufficiently show there is a reasonable probability that, had he received more thorough advice from his defense team, he would have opted for trial rather than accept a plea deal.

## VII. Disposition

¶ 58 We affirm the postconviction court's order denying Rabinkov's motion for postconviction relief.

JUDGE YUN and JUDGE SCHOCK concur.